# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**
   **Plaintiff,**

 v.               Case No. 22-CR-224

**BOBBY McNEIL**
   **Defendant.**

---

## FINDINGS OF FACT AND VERDICT

  The government charged defendant Bobby McNeil in a five-count superseding indictment with (1) sex trafficking by force, fraud, and coercion, 18 U.S.C. § 1591(a)(1), (b)(1); (2) arson in connection with a felony, 18 U.S.C. § 844(h); (3) arson of a building used in interstate commerce, 18 U.S.C. § 844(i); (4) interstate transportation for prostitution, 18 U.S.C. § 2421(a); and (5) unlawful possession of a firearm (a destructive device) as a felon, 18 U.S.C. § 922(g)(1). Defendant waived his right to trial by jury, and the case proceeded to trial before the court on October 15, 2024. The parties requested the court make specific findings of fact. See Fed. R. Crim. P. 23(c). Those findings and the verdict follow.

**I.**

  The evidence in this case establishes beyond a reasonable doubt that in 2021 and 2022 in the Eastern District of Wisconsin defendant sex trafficked AV-1 for his financial benefit, using force, threats, and fraud to keep her in line.[1] When AV-1 traveled to Florida in January 2022 to get away from defendant, he persuaded her to return to continue performing commercial sex

---

[1] Pursuant to the government's unopposed motion, AV-1's real name is being redacted from public court documents. She was, however, referred to by name during the trial.

acts for his benefit, transporting her interstate back to Wisconsin. Finally, the evidence establishes beyond a reasonable doubt that defendant retaliated against AV-1's friend, Enste Tapia, after Tapia tried to help AV-1 escape from defendant, throwing a Molotov cocktail through the window of Tapia's shared residence on February 1, 2022, causing a fire.

AV-1 testified that she obtained drugs from defendant (who went by the names "Messiah and "King"); defendant knew she was addicted to crack and heroin; and she started doing sex dates for defendant, giving him the money she collected from her customers. She usually found dates around National and Greenfield in Milwaukee, completing the sex acts in cars, with defendant waiting for her during the dates. They stayed at defendant's places on National Avenue (Ex. 3, 4) and on Layton Avenue, where defendant's friend Linda Scales lived (Ex. 2). In her testimony, Scales confirmed that defendant and AV-1 stayed with her sometimes.

AV-1 testified that defendant had a number of cell phones, and that he used "TextNow" and Facebook to communicate about their sex trafficking arrangements. The government presented corroboration of defendant's use of these devices and modes of communication. (E.g., Ex. 69, TextNow account.) AV-1 further testified that she and defendant posted prostitution ads, and one of defendant's phones contained a photo taken for a "Skipthegames" ad. (Ex. 60.)

AV-1's testimony that she did sex dates for defendant and gave him the money, with defendant monitoring her activities, is corroborated by testimony from Tapia, who indicated that he saw AV-1 on the street, with defendant about ½ block behind her. Her testimony is further corroborated by contemporaneous communications between AV-1 and defendant:

Ex. 47, defendant texts AV-1 on 12/23/21: "I got somebody else and a ride".

Ex. 49, defendant texts AV-1 on 12/23/21: "You ignoring me and I been found

2

somebody". AV-1 later responds: "Yes Daddy, I'm almost there".

Ex. 78 TextNow communication from defendant to AV-1 on 12/23/21: "you ignoring me"; "I got somebody else with the cash app....and a ride".

Ex. 79 TextNow communication from defendant to AV-1 on 12/23/21: "I GOT SOMEBODY ELSE....AND A RIDE.....WHY NOT BRING THE CASH TO ME".

Ex. 130 Facebook communication from defendant to AV-1 on 12/23/21: "I got somebody else and a ride, BABYGIRL,....you tripping.... wake up....shorty".

Ex. 50, defendant texts AV-1 on 12/24/21, asking: "Did you leave". AV-1 responds: "No not yet.. He talking". Defendant replies: "I was about to say....you might as well walk".

Ex. 51, texts between the two on 12/25/21. AV-1 texts: "I just caught a Mexican, I have 50 for My King". Defendant responds: "Okay".

Ex. 54, texts between the two on 12/26/21. Defendant: "You just jumped in... without talking". AV-1 responds: "Dude been rolling around for the last couple days". Defendant replies a few minutes later: "BABYGIRL, it's a white dude.... circling the block.....looking for you".

Ex. 58, defendant texts AV-1 on 1/4/22: "There's a white guy....in the blue truck.... Rolling AROUND looking for you...." "That's why I was calling you".

AV-1 testified that defendant had "rules" about how she was to engage in acts of prostitution, such as don't go too far and get the money up front. Again, their contemporaneous communications corroborate her testimony and demonstrate that defendant directed her prostitution activities:

Ex. 55, defendant texts AV-1 on 12/27/21: "Don't have the trick to take you to [sic] far".

Ex. 57, defendant texts AV-1 on 1/3/22: "Babygirl, let him know you charge ... $80". "Cash... Don't go down".

AV-1's contemporaneous communications with defendant further demonstrate that he demanded "loyalty", pushed her to get back to "business," and got angry when she didn't bring the money to him:

Ex. 46, defendant texts AV-1 on 12/22/21: "LET'S GET OUR STUFF TOGETHER";

3

"ALL, I ASK IS LOVE, LIFE, LOYALTY"; "I SEE WHAT YOU GRAB ....WE CAN MAKE THAT BACK UP"; "PLEASE LET'S GET STARTED TODAY .... SO WE CAN HAVE A BEAUTIFUL CHRISTMAS".

Ex. 48, defendant texts AV-1 on 12/23/21. "TRUST AND LOYALTY"; "I PUT THAT 'RING' ON YOUR FINGER ... PROMISE!!!!!!"

Ex. 56, defendant texts AV-1 on 12/29/21: "You can still get your shit from the dealer... and let's get back to this business"; "I been good to you.... I know we not enemies now......babygirl, I'm not understanding.... Why, I give you all my shit..... But, you don't want to spend the money with me when you make it".

AV-1 testified that defendant hurt her on several occasions when she did not comply with his directives. Defendant beat her when she wanted to get away, stayed out too long, or "looked at someone" else. Although she could not recall all of these occasions, she related instances where he punched and slapped her, beat her with a metal "old people" cane causing bruises and a broken toe, and hit her all over her body with a belt (using the buckle) causing bruises. On one occasion, when she obtained scissors to defend herself, defendant took the scissors and sliced her, causing scars. (Ex. 116, photo of scars.) AV-1 indicated that defendant also threatened her and her family, saying she better think about her loved ones and that he would cut their throats if she didn't return. AV-1 further testified that defendant forced her to do dates and got mad when she said she was tired and wasn't making money. She denied that her clients engaged in violence and indicated that she didn't report defendant's violence to the police or seek medical attention.

AV-1's testimony about the injuries defendant caused her is corroborated by testimony from Tapia and Scales. Scales testified that on one occasion she observed defendant hit AV-1. She also observed an incident where defendant pulled AV-1's hair and threatened to light her hair on fire. Tapia testified that he observed AV-1 with injuries, and AV-1 said defendant beat her with a belt buckle. On another occasion, he observed her with a gash on her head and a

4

broken toe, from when defendant beat her with the cane. The testimony that AV-1 reported her injuries to Tapia is confirmed by their contemporaneous communications:

Ex. 110, AV-1 texts Tapia on 12/21/21: "Hey it's me Yari.. Could you please come get me?" "He did it again".

AV-1 further testified that at times defendant would apologize after he got violent with her and try to coax her to return, telling her he loved her, buying her things, and offering drugs. AV-1 testified that she tried to get away from defendant more than once, and he called and texted to get her to come back, telling her not to "fear" him. Again, the communications introduced by the government corroborate her testimony:

Ex. 82, defendant texts AV-1 on 12/11/21: "BABYGIRL, PLEASE DON'T FEAR ME".

Ex. 83, defendant texts AV1 on 12/12/21: "FIND IT IN YOUR HEART TO COME BACK TO YOUR KING".

Ex. 84, defendant texts AV-1 on 12/12/21: "THAT'S ME SINCERELY APOLOGIZING TO YOU AGAIN".

Ex. 128, defendant Facebook messages AV-1 on 12/12/22: "I SINCERELY APOLOGIZE FOR GRABBING YOU".

Ex. 87, defendant texts AV-1 on 12/13/21: "DON'T FEAR".

Ex. 93, defendant texts AV-1 on 12/15/21: "WE, STILL WORKING WITH EACH OTHER???? I DO UNDERSTAND 'YOUNG GODDESS'....I'M OPEN MINDED...I KNOW HOW YOU WAS FEELING AT THAT MOMENT...YOU DIDN'T EVEN ALLOW ME TO SURPRISE YOU...I HAD A WHILE $40 WORTH UNDER YOUR PUZZLE BOOK....JUST TO SHOW YOU LOVE....REMEMBER, I GOT THE SAME SHIT EVERYBODY ELSE GOT....YOU DON'T HAVE TO LEAVE 'DADDY' HANGING"[2]

Ex. 96A, defendant texts AV-1 on 12/19/21: "I WANT TO SINCERELY APOLOGIZING [sic] TO YOU"; "I WAS A LITTLE AGGRESSIVE...I JUST WANTED YOU TO REMAIN FOCUSED".

Ex. 76, defendant texts AV-1 on 12/22/21: "I SINCERELY APOLOGIZE FOR

---

[2]AV-1 testified that this message referred to $40 worth of drugs.

5

GRABBING YOU".

Ex. 42, defendant texts AV-1 on 12/22/21: "ALL YOU NEED IS THE KING..... THE LOVE NEVER LEFT HERE"

Ex. 46, defendant texts AV-1 on 12/22/21: "I'M VERY OPEN MINDED....I LOVE YOU".

Ex. 132, defendant Facebook messages AV-1 on 12/24/21: "I JUST WANT TO SINCERELY APOLOGIZE TO YOU"; "AS YOU CAN SEE, I SENT SYCO [sic]".[3]

Ex. 70, photo collage defendant gave AV-1 featuring AV-1's children and a ring.

Ex. 88, offering AV-1 a new coat. Ex. 89, photo of the coat.

AV-1's testimony that defendant gave her drugs and got angry when she took "the money" to others is also corroborated by defendant's own words. (Ex. 43A at 1, defendant asking: "why take the money to them" when he was "feeding you dope all day"; Ex. 43A at 2, "You got what you got from him. You know what I'm saying okay you done with that lick! Let's make other moves so we can get shit together baby girl." (Ex. 43A at 2.)

AV-1 testified that she met Tapia when, while riding her bike, she was hit by a car, and Tapia stopped to help her. They later reconnected and developed a relationship. Tapia learned that she engaged in prostitution and used drugs, and he tried to help her get clean. Tapia also learned about defendant and observed the injuries defendant caused AV-1. At times, AV-1 stayed with Tapia, which angered defendant.

Tapia similarly testified that he initially met AV-1 after her bike accident. In September 2021, they met again and developed a relationship. Tapia learned AV-1 was a prostitute and later learned of her association with defendant. He indicated that he saw AV-1 on the street, with defendant about ½ block behind her. Tapia also learned that AV-1 abused drugs, and he

---

[3]Although defendant denied it, in context he clearly meant to say, "I went psycho".

6

tried to help her get treatment, including taking her to Rogers Hospital. At times, when she left defendant, AV-1 stayed with him. He observed her with injuries caused by defendant. He testified that she was afraid to go to the police or seek medical treatment.

AV-1 and Tapia testified that, on or about January 5, 2022, Tapia drove AV-1 to Florida to get away from defendant, stay with relatives, and try to get clean. On the way to Florida, Tapia received a text from defendant, asking where AV-1 was. (Ex. 113, "Jimmy . . . Where is Yaya".)[4] Tapia falsely told defendant that he "dropped her off on 26th" Street. Tapia returned to Milwaukee, while AV-1 stayed in Florida. During her time away, defendant contacted AV-1 via Facebook seeking to persuade her to return and resume doing sex dates for him:

Ex. 133: "You got the 'key' .... Can we please get back to BUSINESS".

Ex. 134: "Please LET'S GET BACK TO THIS MONEY YOUNG GODDESS.....WITH 'DADDY'".

Ex. 118: "If a mf not talk them Dead Presidents ..... Fuck[] Them"; "We building a 'EMPIRE'". AV-1 responded: "I understood king".

During AV-1's time in Florida, defendant also harassed AV-1's mother, wanting to know where AV-1 was and demanding "my money." The messages turned threatening, and AV-1's mother testified that she became worried and went to the police. (Ex. 64, 136.)

On January 26, 2022, AV-1 flew back to Milwaukee using a ticket defendant purchased for her. (Ex. 25.) Defendant picked her up at the airport, as confirmed by airport surveillance footage (Ex. 22, 23, 24), with defendant's associate "B" driving (Ex. 143). AV-1 testified that they returned to the residence on 26th and National, and she did a sex date that same day, giving defendant the money. She further testified that defendant got violent again, so she

---

[4]Tapia testified that his nickname is Jimmy. "Yaya" is a nickname for AV-1.

7

contacted Tapia to come get her.

Tapia confirmed that he picked AV-1 up from the National residence soon after she returned to Wisconsin, which angered defendant. On January 26, 2022, defendant texted Tapia: "You to [sic] amateur to dip in a professional business sucka". (Ex. 114.) Defendant's messages directed at AV-1 and Tapia over the following days confirm his consuming rage over the interference with his sex trafficking business:

> Ex. 115, 1/27/22 text to Tapia but directed at AV-1: "ALL YOU HAD TO DO IS BE REAL .... IN SAY YOU WANT TO GET 'HIGH' .... I WOULD OF 'BLESSED' YOU".
>
> Ex. 121B, 1/27/22 & 1/28/22 Facebook messages: "This is the wrong path to go down ... Babygirl!!!"; "ALL YOU HAD TO DO IS BE REAL.....IN JUST SAID YOU WANT TO GET 'HIGH'.....I WOULD'VE 'BLESSED YOU".
>
> Ex. 121C, 1/29/22 Facebook message: "I'M BEING PATIENT ..... BEFORE I GIVE A INDIVIDUAL A REAL REASON TO BE AGAINST ME..... PLAY ME ..... MY PERFORMANCE....YES,...100 TIMES WORSE .... TRUE MEANING OF DEVIOUS AND DEVASTATING ...... PLEASE DON'T PLAY YOUR SELF".
>
> Ex. 121A, 1/30/22 Facebook message, referring to AV-1 going to Tapia's residence, "on orchard right there on 21st".
>
> Ex. 121D, 1/30/22 Facebook message: "YOU TAKE MY SHIT AND DON'T SHOP WITH ME".
>
> Ex. 121E, 1/30/22 Facebook message: "YOU SHOW HATE .... YOUR HATE IS FUNNY ..... MINES IS DEVELISH ..... DEEP DEEP".
>
> Ex. 121F, 1/30/22 Facebook message: "The b**** Mama live right around the corner [and] she ain't thinking about her loved ones at all"; "can't stay in the shadows forever"; "this right here going to wake him up"; "they going to feel sorry".
>
> Ex. 121G, 1/30/22 Facebook message referencing "PAYBACK".
>
> Ex. 121H, 1/30/22 Facebook message, "You need to fix this A.S.A.P.!!!!!!"
>
> Ex. 122 1/30/22 audio message: "I get my payback one way or another."
>
> Ex. 125 1/30/22 audio message:"like they gonna save her" and "my patience is running thin".

8

Tapia testified that AV-1 stayed with him for a few days, but then left due to defendant's threats.

AV-1 testified that on February 1, 2022, she and defendant left the National Avenue residence, with B driving; they traveled to the vicinity of Tapia's residence, parking a block away. AV-1 testified that she told defendant where Tapia lived; as indicated above, defendant's 1/30/22 Facebook communication reveals that he knew where Tapia lived. (Ex. 121A.) Defendant got out of the car, left for a time, and then returned; AV-1 and B stayed in the car. They then returned to the National residence. Surveillance video from the building shows defendant and AV-1 leaving at 12:37 (Ex. 99, 100) and returning at 2:43 (Ex. 101, 102), about 10 minutes after police responded to the fire at Tapia's residence (Ex. 147 at 1, indicating police responded at 2:33).

FBI Special Agent George Rienerth conducted cell site analysis of two phones (one belonging to defendant and the other to "B") on February 1, 2022, mapping three addresses (defendant's residences on Layton and National, and Tapia's residence on 21st Street). Phone records revealed that defendant called B at 12:30 and that their phones were together around the National Avenue residence at 12:37, the same time the building surveillance video showed defendant and AV-1 leaving the residence. (Ex. 108 at 7.) Between 2:27 and 2:33, the time of the arson, the phones were near the scene of the arson. (Ex. 108 at 8.) Between 2:40 and 2:59, the phones returned to the area of the National residence (Ex. 108 at 9), again consistent with the building surveillance video showing defendant and AV-1 return at 2:43. B's phone moved on at around 2:52. (R. 108 at 9.)

Miguel Vargas testified that in the early morning hours of February 1, 2022, he was awakened by a dog barking. On entering the kitchen, he observed a fire, which he was able

9

to extinguish by repeatedly throwing water on it. He further observed that a bottle (a Molotov cocktail) had been thrown through the window (Ex. 11, 12), and he smelled gas. Vargas went outside and observed another bottle (Molotov cocktail), and he put snow on it to extinguish it. (Ex. 9, 13, 14, 16.) In addition to the bottle shattering the window (Ex. 20, 21), the fire damaged a door leading from the kitchen to a room where Vargas's grandchildren were sleeping and the adjoining wall/floor (Ex. 10A, 17). Vargas testified that the landlord put a metal panel over the damaged window.

Vargas and Tapia testified that they (along with other family members) lived together in this rental property on South 21st Street in Milwaukee, paying $1500/month rent. Tapia testified that he was asleep when, on February 1, 2022, the Molotov cocktail was thrown through the kitchen window. Tapia immediately told police that defendant, whom he knew as Messiah, did it, showing police a photo. He further reported that he had received threatening messages from defendant.

Milwaukee Police Department Detective Curtis Pelczynsky responded to the arson and did a walk-through of the building. He observed the bottle in the kitchen and smelled gas. He collected evidence, including the bottles and the wick. The Wisconsin State Crime Lab confirmed the presence of gasoline in the liquid recovered from the glass bottle and the fabric wick. (Ex. 106.) Jason Vary, an ATF destructive device examiner, described how a Molotov cocktail is constructed and used. He reviewed the two items seized from the arson scene in this case and confirmed that they are incendiary bombs, which qualify as "destructive devices." (Ex. 104.)

Rick Hankins, an ATF Special Agent and fire investigator, testified that he responded to the scene of the arson in this case and discovered it involved a rental property, which

supplies federal jurisdiction. He analyzed the bottles and confirmed that they were made in Texas. He also authored an origin and cause report regarding the fire, concluding that the fire originated inside the kitchen as the result of an incendiary device being thrown through the kitchen window. (Ex. 147 at 8.)

As indicated, Tapia reported to law enforcement that he knew who did it and showed law enforcement a photo of the suspect. The ATF used facial recognition to identify the photo as defendant, a/k/a Messiah. Law enforcement identified two residences for defendant, both relatively close to the arson scene. Law enforcement searched both, seizing a number of cellular devices. They also obtained surveillance video from defendant's apartment building on National, which revealed defendant and AV-1 leaving before the fire and returning just after the arson was reported. Agents also obtained access to defendant and AV-1's Facebook accounts. Agents further obtained phone records, which revealed that defendant called "B" (later identified as Aaron Harris) shortly before the fire, which confirmed the information agents had received that B picked up defendant and AV-1 at that time. Agents also obtained flight records, which confirmed that defendant paid for AV-1's return flight from Florida.

Neal Lofy, a special agent with the Wisconsin Department of Justice, Division of Criminal Investigation, testified as an expert in human trafficking cases. He indicated that on the southside of Milwaukee the areas of National and Greenfield are known for prostitution activity. He has seen all sizes of operations. Traffickers looks for vulnerable victims, e.g., homeless, drug-addicted, poor, young and lacking family support. It is fairly common to see the relationship between victim and trafficker to begin as a romantic one. Traffickers lure victims in with promises. They may also use force, isolate the victims from others, and control their access to drugs. They are usually not violent at the start (and also not violent daily). Victims are

usually not physically restrained but are afraid to leave, have nowhere to go, and fear they won't be believed. It is common for victims to leave and return. Victim disclosure is usually piecemeal; officers don't get the full story at the start. Many pimps also provide drugs. They prey on addicts, who are more desperate, and want their victims to obtain dope only from them. Lofy did not know the facts of this case.

Defendant presented the testimony of Kory Harrison, who indicated that in 2024 he was in jail with defendant, whom he knew from the streets. Harrison learned defendant was facing charges related to AV-1, an ex-girlfriend of his. Harrison admitted he used drugs with AV-1. He indicated that at some point AV-1 told him that one of her regulars was working with the police, trying to get her to turn on defendant. He mailed a statement to the court about what he allegedly had been told. (Ex. 144A.) He wasn't sure when AV-1 told him this story, perhaps winter 2021-22. Harrison admitted defendant told him the case number and judge in the case, helped him "format" the letter, and was with him when he wrote the letter. Defendant also told him to put quote marks around some works and underline others, and to get it notarized. Harrison denied that defendant promised him anything for the letter or ever put money on his books.

Defendant, who has six prior convictions, testified that he met AV-1 in October 2021, and that she needed a friend in her life. She thought he was a potential customer, but he declined. He testified that he felt sympathy for her and let her stay with him. He moved to the southside to live with her; she wanted to stay on the southside, where she had customers and dealers. She called him Papi or Daddy, like Hispanics do; that had nothing to do with prostitution, he claimed. They stayed with Scales sometimes. They argued because AV-1 stole money from him for drugs. Defendant denied he slapped AV-1 in front of Scales.

12

Defendant testified that he knew AV-1 was going to Florida, that they stayed in contact while she was there, and that he bought her plane ticket back. He claimed AV-1 manipulated him, stating she had changed and suggesting they could have a relationship. He picked her up from the airport and took her to the residence on National. She soon wanted crack and left, with Tapia.

Defendant claimed he did not know Tapia and did not send Tapia messages. He claimed the recorded messages about "payback" were not directed at AV-1 or Tapia, and that he just left his phone on while he was talking. Defendant testified that on the night of the arson, he left the apartment with AV-1 because she wanted to go somewhere, but he could not recall where that was. He denied going to Tapia's house or throwing a Molotov cocktail through the window. Regarding the messages to AV-1's mother, he denied they were related to prostitution; he wanted to return AV-1's quest card and get back the money AV-1 stole from him.

Defendant denied inducing Harrison to prepare the letter or testify, and said he never put money on his books. He also denied that he pimped AV-1 or forced her to turn tricks.

On cross examination, the government confronted defendant about his message to AV-1 that she had the "key" and getting "back to BUSINESS," but he claimed that wasn't about prostitution; it meant get her life back on track, and the key was the key to their apartment. (Ex. 133.) He also denied the message about getting "back to this money" was about prostitution. (Ex. 134.) The message about "working with each other" also wasn't about prostitution, he claimed. Confronted with the message about charging $80 (Ex. 57), defendant denied it was about a sex date, suggesting it could be about a massage. The message about "building a 'EMPIRE'" was just slang for a long lasting relationship. The reference to "Dead Presidents" could have referred to the movie of the same name, but he didn't know what it meant. (Ex.

13

118.)

Defendant denied he ever hit AV-1; he just stopped her from hurting him when she got aggressive. He didn't apologize for hurting her; he felt bad he had to grab her to prevent her from hurting him. He also denied the threats on the recorded calls were about Tapia or prostitution.

**II.**

**Count one** alleges that beginning on or about February 1, 2021, and continuing through on or about February 18, 2022, defendant, in and affecting interstate commerce, did knowingly recruit, entice, harbor, transport, provide, advertise, obtain, and maintain by any means AV-1, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, and any combination of such means, would be used to cause AV-1 to engage in commercial sex acts. To obtain a conviction, the government must prove that (1) defendant knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, or maintained by any means AV-1; (2) defendant knew or recklessly disregarded the fact that force, threats of force, fraud, or coercion would be used to cause AV-1 to engage in a commercial sex act; and (3) the offense was in or affecting interstate commerce.

The government proved each of these elements beyond a reasonable doubt. First, defendant recruited and enticed AV-1 to perform sex dates for his financial benefit, monitoring her activities and setting the "rules." (Ex. 50, 51, 54, 55, 57, 58.) He provided her for sex dates by locating customers and transported her by arranging rides. (Ex. 47, 49, 78, 79, 130.) He harbored her by providing places for her to stay on the southside. (Ex. 2, 3.) He maintained her by directing her activities and providing dope to feed her addiction. (Ex. 43, 93.)

14

Second, defendant used force, threats, fraud, and coercion to cause AV-1 to engage in commercial sex acts. AV-1 testified that defendant beat her with his hands, a belt, and a cane, which was corroborated by testimony from Scales and Tapia, as well as by AV-1's texts to Tapia. (Ex. 110: "He did it again"). On several occasions, defendant apologized for the physical abuse, telling AV-1 not to fear him, and fraudulently inducing her to return with gifts and/or drugs. (Ex. 82, 84, 128, 87, 93, 96A.) He also induced her to stay with him by stressing the need for "loyalty," promising to put a ring on her finger, and suggesting they had a future. (Ex. 46, 48.) He further preyed on her drug addiction. (Ex. 43A.) Finally, defendant coerced AV-1 to continue performing commercial sex acts by directing threats at her mother and children; his intimidating communications with AV-1's mother reflect his motive to locate her and get "his money" back. (Ex. 64, 136.)

Third, the offense was in or affecting interstate commerce. Defendant used facilities of interstate commerce to facilitate the sex trafficking, including multiple cell phones, the TextNow app, and Facebook. He flew AV-1 from Florida to Wisconsin to resume her performance of sex dates for him. (Ex. 25.) AV-1 testified that she and defendant posted ads, and one of defendant's phones contained a photo of AV-1 taken for purposes of an ad. (Ex. 60.)

**Count two** alleges that on or about February 1, 2022, defendant knowingly used fire to commit a felony prosecutable in a court of the United States, namely sex trafficking by force, fraud, and coercion, as charged in count one. To obtain a conviction, the government must prove that (1) defendant knowingly used fire, and (2) the fire was used to commit sex trafficking, a felony which may be prosecuted in a court of the United States.

The government proved these elements beyond a reasonable doubt. The evidence establishes beyond a reasonable doubt that on February 1, 2022, at around 2:30 a.m.,

defendant threw a Molotov cocktail through the window of the Vargas/Tapia home, causing a fire in the kitchen, and that he did so as "payback" for Tapia's interfering with defendant's sex trafficking of AV-1. The objective evidence (surveillance video and cell site analysis) corroborates AV-1's testimony that on the night in question they left the National residence, with B driving, and traveled to the vicinity of the Vargas/Tapia residence, then returned to the National residence. (Ex. 99-102, 108.) And defendant's own words demonstrate that he started this fire as "payback" for Tapia interfering with the sex trafficking operation.[5] (Ex. 114: "You to [sic] amateur to dip in a professional business sucka"; Ex.121A: referring to Tapia's residence; Ex. 121F: "this right here going to wake him up"; Ex. 121G: "PAYBACK"; Ex. 125: "like they gonna save her".) While it is true, as defense counsel argued in closing, that the government provided no forensic (fingerprints or DNA) or eyewitness testimony that defendant committed the arson, the government presented a compelling circumstantial case.

**Count three** charges that, on or about February 1, 2022, defendant maliciously damaged, by means of fire, xxxx South 21st Street, Milwaukee, Wisconsin, which was a building used in interstate commerce. To obtain a conviction, the government must prove that defendant (1) maliciously damaged the property identified in the indictment, (2) by means of fire, and (3) at the time of the fire the property was used in interstate commerce.

The government proved this offense beyond a reasonable doubt. In order to get revenge on Tapia, defendant damaged Tapia's residence, including the window, door, floor, and wall, by means of fire caused by a Molotov cocktail. (Ex. 147.) He did so maliciously, as "payback" for Tapia's interference with defendant's pimping of AV-1. The residence was a rental property,

---

[5]As discussed above, the government proved beyond a reasonable doubt that defendant engaged in sex trafficking as alleged in count one.

16

as Vargas and Tapia testified, and thus used in interstate commerce.

**Count four** alleges that, on or about January 26, 2022, defendant did knowingly transport AV-1 in interstate commerce with the intent that AV-1 engage in prostitution. To obtain a conviction, the government must prove (1) that defendant knowingly transported AV-1 in interstate commerce; and (2) that defendant transported AV-1 with the intent that AV-1 engage in prostitution.

The government proved this offense beyond a reasonable doubt. Defendant flew AV-1 from Florida to Wisconsin, paying for her ticket and picking her up at the airport. (Ex. 22-25.) His messages to AV-1 and her mother demonstrate that he did so for the purpose of having AV-1 resume prostitution activities, i.e., engaging in sexual acts in exchange for money, for defendant's financial benefit. (Ex. 133, 136.) That AV-1 might have returned to Wisconsin anyway, e.g., for drugs, is irrelevant. Defendant's intent was that she resume prostitution for his benefit.

**Count five** alleges that, on or about February 1, 2022, defendant, knowing he previously had been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm (a destructive device) which, prior to his possession of it in whole or in part, had been transported in interstate commerce, the possession of which was therefore in and affecting commerce. The firearm (destructive device) is more fully described as a glass bottle filled with gasoline and a fabric wick, commonly known as a Molotov cocktail. To obtain a conviction, the government must prove that (1) defendant knowingly possessed a firearm; (2) at the time of the charged act, defendant had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year; (3) at the time of the

17

possession, defendant knew that he had been convicted of a crime punishable by imprisonment for a term exceeding one year; and (4) the firearm had been shipped or transported in interstate commerce before defendant received it.

The government proved each of these elements beyond a reasonable doubt. On or about February 1, 2022, defendant knowingly possessed a Molotov cocktail, which Vary identified as a destructive device (Ex. 104), which defendant threw through the window of Tapia's residence. The parties stipulated that defendant had been convicted of a felony, and knew he had been so convicted, at the time, and Hankins testified that the bottles were made in Texas and thus traveled interstate prior to defendant's possession of them.

\* \* \*

Harrison's testimony—that AV-1 admitted to him that she lied about defendant—was not credible. Harrison admitted on the stand that defendant helped him prepare the letter he sent the court originally making this claim (Ex. 144A), and he could not recall with any specificity when AV-1 allegedly told him this story.

Defendant's denials that he pimped AV-1 were not credible. His communications with AV-1, summarized above, show that he trafficked her. (Ex. 47, 50, 51, 55, 57, 58.) His communications with AV-1 further demonstrate that he persuaded her to return to Wisconsin from Florida to "get back to business," i.e., prostitution. (Ex. 133, 134.) Defendant's contention that his reference to "Dead Presidents" could have meant the movie of the same name, and that his reference to AV-1 having the "key" meant to the key to their apartment, were preposterous. Defendant's denials that he abused AV-1 were likewise incredible, and contrary to the testimony from Scales and from Tapia (whom I found particularly credible). Defendant's claim that he repeatedly "apologized" to AV-1 only for restraining her to prevent her from

18

hurting him when she got aggressive is likewise unworthy of belief, particularly given the significant size difference between the two. Finally, defendant's claims that he did not know Tapia and did not communicate with Tapia were also flatly contradicted by defendant's own words. (Ex. 113: "Jimmy ... Where is Yaya"; Ex. 121A, referring to Tapia's residence.) Defendant's contention that his repeated messages about "payback" were not directed at AV-1 and Tapia, and that when he left the apartment with AV-1 on February 1, 2022, they traveled to some other location at her behest, not to Tapia's residence to commit the arson, are likewise unworthy of belief.

**III.**

On count one, the court finds the defendant, Bobby McNeil, guilty.

On count two, the court finds the defendant, Bobby McNeil, guilty.

On count three, the court finds the defendant, Bobby McNeil, guilty.

On count four, the court finds the defendant, Bobby McNeil, guilty.

On count five, the court finds the defendant, Bobby McNeil, guilty.

Dated at Milwaukee, Wisconsin, this 28th day of October, 2024.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge